**In re James Owen MURPHY, Jr. d/b/a Murphy's Golf Shop, Debtor.**

**In re Stanley Joseph Goralski, Doris Ann Goralski, Debtors.**

**Nos. 03–15596–SSM, 03–12055–SSM.**

United States Bankruptcy Court, E.D. Virginia, Alexandria Division.

Jan. 12, 2005.

---

Bennett A. Brown, The Law Office of Bennett A. Brown, Timothy J. McGary, Fairfax, VA, for Debtor.

## MEMORANDUM OPINION

STEPHEN S. MITCHELL,
Bankruptcy Judge.

Before the court are motions by the chapter 13 trustee (a) for reconsideration of orders authorizing the sale and refinance of real estate owned by the debtors in these two cases and (b) for modification of their confirmed plans to increase the distribution to unsecured creditors to 100 cents on the dollar. The issue is whether debtors whose confirmed plans provide for less than full payment of unsecured claims, and who sell or refinance real property in order to pay off their plans early, must share any increase in the value of the property with their creditors or instead may simply pay the chapter 13 trustee an amount equal to the remaining payments due under the plan. In the original rulings, the court held (1) that a debtor selling real estate could be required to pay filed claims in full to the extent the sales proceeds were sufficient for that purpose, but (2) that a debtor refinancing rather than selling real estate could simply pay the remaining amount of the scheduled plan payments. The trustee seeks reconsideration of both rulings[1] as well as an order modifying the confirmed plans. The debtors, not surprisingly, oppose plan modification and insist they should not be required to pay any more than the remaining payments due under the plan.

### Background

#### A. The current "hot" real estate market.

At the heart of the present dispute is the remarkable appreciation in the value of real estate over the last several years

---

1. Although the ruling on the sale motion favored the trustee, the order allowed the trustee to immediately disburse to creditors only an amount equal to the remaining payments required by the confirmed plan, with the disbursement of the remaining portion to be set forth in a separate order. It is presumably to obtain a ruling with respect to the remaining sums in escrow that the trustee filed the motion for reconsideration, which would perhaps more accurately be considered a motion for supplemental relief.

within the geographic area encompassed by the Eastern District of Virginia. Figures compiled by the federal Office of Federal Housing Enterprise Oversight reflect a one-year increase in the price of existing houses in Virginia of 18.14% for the recent year ending September 30, 2004, and a five-year increase of 60.75%. Office of Federal Housing Enterprise Oversight, *OFHEO House Price Index: House Price Gains Continue to Accelerate* 10, at *www.ofheo.gov/media/pdf/3q04hpi.pdf* (Dec. 1, 2004). This compares with 12.97% and 48.46%, respectively, for the United States as a whole. *Id.* Several areas within Virginia show even more dramatic appreciation. For example, the one-year appreciation for the Washington–Arlington–Alexandria DC–VA–MD–WV metropolitan statistical area (MSA), which covers a large portion of the Alexandria Division of this court, was a whopping 24.01%, and the five-year appreciation was 86.02%. *Id.* at 21. The Virginia Beach–Norfolk–Newport News VA–NC MSA, which similarly covers a large portion of the Norfolk and Newport News Divisions of this court, came in almost as high with a one-year appreciation of 22.82% and a five-year appreciation of 57.64%. *Id.* at 31. In the Richmond MSA, by contrast, gains were relatively modest at 13.37% and 41.46%, respectively. *Id.* at 29. Of course, real estate has not always appreciated so dramatically, and there have been times in the past twenty years in which housing values not only did not surge but actually fell.[2] Overall, in the 20 years from 3rd quarter 1984 through 3rd quarter 2004, the average annual increase for the state of Virginia was approximately 5.5%, although the variation in individual years could be quite large.

## B. The motion in the Murphy case to approve sale of real property.

James Owen Murphy filed a voluntary chapter 13 petition in this court on December 15, 2003. On his schedules, he listed an ownership interest in a condominium located at 10125 Oakton Terrace Road, Oakton, Virginia, which he valued at $155,000, subject to a deed of trust having a balance of $121,000. His schedules listed $52,374.37 in unsecured debts. After the trustee filed an objection to his original plan, the debtor filed an amended plan on March 22, 2004. That plan, which was confirmed on April 29, 2004, required the debtor to pay the chapter 13 trustee $700.00 per month for 36 months and projected a dividend to unsecured creditors of 37 cents on the dollar.[3] The debtor's mortgage was current, and the plan simply provided that the debtor would continue to make direct payment of the monthly installments as they became due.

---

**2.** Attached as an exhibit to this opinion is a graph reflecting housing price index data for the United States, the State of Virginia, and the Washington–Arlington–Alexandria MSA as downloaded from the Office of Housing Enterprise Oversight web site. The graph shows the increase for the 3rd quarter of each year over the corresponding quarter of the prior year. The third quarter values were used because those were the most recent figures available for 2004.

**3.** The standard form of plan is this district is a so-called "pot" plan rather than a "percentage" plan. *See In re Witkowski,* 16 F.3d 739, 741, 746 & n. 11 (7th Cir.1994) (explaining difference). In a percentage plan, creditors receive a set percentage of their allowed claims while leaving the exact amount the debtor will pay in flux until all claims are resolved. In a pot plan, by contrast, the debtor pays a fixed amount, and unsecured creditors are paid pro rata from the "pot" that remains after payment of priority and secured claims. The form plan in this district requires the debtor to provide a good-faith estimate of the dividend on unsecured claims, but the percentage shown is simply an estimate, and the actual dividend may be either higher or lower depending the amount of claims that are ultimately filed and allowed.

The plan—which conformed to the standard form of plan required by the local bankruptcy rules in this district [4]—provided that property of the estate would revest in the debtor on confirmation but nevertheless required that the debtor obtain court approval to sell real property. Plan § B–9 & B–10. On November 8, 2004, the debtor filed a motion for authority to sell his residence for $235,000.00, explaining that he had obtained a new job in Pennsylvania and needed to move. The trustee did not object to the sale, but stated at the hearing that he needed $29,000 from the sale to pay the filed claims in full. The debtor objected to paying the trustee anything more than the approximately $12,000.00 still owed on the plan. The court ruled that the sales proceeds constituted disposable income that had to be applied to the plan and directed that $30,000 be turned over to the trustee. Because debtor's counsel stated that he intended to appeal the ruling, and so that there could be a final order to allow the contract to go to settlement, the order entered on November 12, 2004, simply approved the sale and stated that disposition of the $30,000 would be the subject of a further order. The court's bench ruling allowed the trustee to disburse up to $11,973.86 of the proceeds (the amount needed to complete the scheduled plan payments) but required the trustee to hold the balance of the $30,000 pending further order of the court. Although the ruling technically favored the trustee, it was the trustee rather than the debtor who on November 17, 2004, filed a motion for reconsideration (presumably because the ruling did not allow immediate payment of the filed claims in full). Contemporaneously with the motion for reconsideration, the trustee filed a motion to modify plan payments to require that the funding of the plan be increased to the $5,990.00 that had already been paid, plus a lump sum payment of $30,000.00 from the sale of the debtor's principal residence to allow for payment of all filed claims at 100%.

C.  *The motion in the Goralski case to approve refinance of real property.*

Stanley Joseph Goralski and Doris Ann Goralski filed a joint voluntary chapter 13 petition in this court on April 29, 2003. The schedules filed with the petition reflected that they owned real property located at 13617 Chevy Chase Lane, Chantilly, Virginia, which they valued at $223,000. The schedules further reflected that the property was subject to liens in the total amount of $192,400.09. The plan filed by the debtors with their petition was confirmed without objection on September 18, 2003. It requires the debtors to pay the chapter 13 trustee $1,100.00 per month for 36 months and estimates a 28 percent dividend to unsecured creditors. Like the plan in the Murphy case, it provided for property of the estate to revest in the debtors upon confirmation. Plan § B–9.

On October 21, 2004—approximately eighteen months after the petition was filed and seventeen months into the plan—the debtors filed a motion for permission to refinance their property in order to pay off the existing liens as well as their chapter 13 plan. The reason given for seeking to refinance was that Mr. Goralski's earned income had been reduced by approximately one-half, and that having to make plan payments would create an undue hardship on the debtors because their current monthly income was insufficient to both make the plan payments and pay their ordinary and necessary business expenses.[5] A hearing on the motion to bor-

---

4.  LBR 3015–2(A) & Ex. 1.

5.  Although the motion stated that a copy of. the loan approval was attached, no such doc-

row was held on November 10, 2004. Although the chapter 13 trustee had not filed an objection to the motion, he took the position at the hearing that to the extent the proceeds from the refinance were sufficient to pay filed claims in full rather than at the 28% compromise amount in the confirmed plan, any refinance should be contingent upon the debtors turning over an amount sufficient to pay the filed claims in full. Based on the court's prior unpublished opinion in *In re Michael James Davis and Gina Andre W. Davis,* No. 98–15363–SSM (April 25, 2003), which had rejected a similar argument by the trustee, the court overruled the trustee's objection and granted the motion to borrow. An order reflecting that ruling was entered on November 16, 2004.[6] The next day, the trustee filed a motion to reconsider, as well as a "motion to modify plan" asking that the debtor's plan be modified to require payment to the trustee of "$19,800.00 paid to date plus a lump sum payment in the amount of $64,365.00 from the refinance of the Debtors' principal residence to allow for payment of all filed claims at 100%."

### Discussion

### I.

The purpose of chapter 13 is to enable a financially strapped debtor to repay creditors to the best of his or her ability under court protection and court supervision. Although secured and priority claims must be paid in full, unsecured debts may be paid in a compromise amount so long as the plan is proposed in good faith, the present value of what creditors receive is at least as much as they would receive in a chapter 7 liquidation, and the debtor pays

into the plan his or her disposable income for at least 36 months. §§ 1325(a)(3), (4), & (b)(1)(B), Bankruptcy Code; *Deans v. O'Donnell,* 692 F.2d 968 (4th Cir.1982) (adopting totality of circumstances test for good faith where debtor proposes no or only minimal payment of unsecured claims).

Once confirmed, a chapter 13 plan binds the debtor and each creditor. § 1327(a), Bankruptcy Code. Nevertheless, even a confirmed plan is not carved in stone. At any time before completion of payments under the plan, the debtor, the trustee, or an unsecured creditor may request modification of the plan to, among other things, "increase or reduce the amount of payments on claims of a particular class provided for by the plan" or to "extend or reduce the time for such payments." § 1329(a)(1) & (2), Bankruptcy Code. Thus, a court may require that payments under a compromise plan be increased if the debtor's financial situation, and thus his or her ability to pay, dramatically improves subsequent to confirmation. *Arnold v. Weast (In re Arnold),* 869 F.2d 240 (4th Cir.1989) (bankruptcy court did not err in requiring increased monthly payment and extending plan period on creditor's motion after substantial unanticipated increase in debtor's income).

The trustee's position, succinctly stated, is that both the motion to sell and the motion to borrow were, in substance if not in name, motions to modify the confirmed plans. Modification of a confirmed plan in turn requires that the plan, as modified, satisfy the confirmation requirements of § 1325(a). § 1329(b)(1), Bankruptcy Code.

---

ument was actually attached. Thus, the court is not advised as to the amount loaned or its repayment terms, and, in particular, the monthly payment amount compared with the existing mortgage.

**6.** Based on the trustee's stated intention of filing a motion to reconsider, the order required that $19,800.00 from the refinance be paid to the trustee and that $43,815 be held in escrow by the debtors' counsel to abide the court's ruling on the motion to reconsider.

These include not only the general requirement of good faith under § 1325(a)(3), but also the requirement that

the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of this title on such date[.]

§ 1325(a)(4). Thus, the trustee argues, any appreciation in the value of the real property must be made available to unsecured creditors to the extent necessary to insure that they receive what they would receive if the debtor's estate were liquidated under chapter 7 on the date of the plan modification.

## II.

Neither the Supreme Court nor the Fourth Circuit have ruled on this issue. However, the trustee and the debtors each find support for their respective positions in the reported case law in various jurisdictions. The court examines separately the reported cases involving sale and those involving refinance.

### A. Post–Confirmation Sale of Real Estate

The leading case supporting the trustee's position with respect to a post-confirmation sale is *Barbosa v. Soloman*, 235 F.3d 31 (1st Cir.2000). In that case, the debtors had a confirmed chapter 13 plan that called for a 10% payout to unsecured creditors. Among the debtors' assets was a two-family building the debtors retained for investment purposes. This building had a stipulated market value of $64,000 about a year before the filing of the plan. After the entry of the confirmation order, the debtors sought permission from the bankruptcy court to sell the property free and clear of liens. The court granted their request, and the property was sold for $137,500. The trustee then moved to compel the debtors to modify their plan so that the excess proceeds would be used to pay off other unsecured creditors, thus raising the payout to 100%. The First Circuit, affirming the district court and bankruptcy court, found in favor of the trustee. First, the court determined that under § 1327 of the Bankruptcy Code, property of the estate at confirmation vests in the debtor free of any creditors' claims. However, the estate does not cease to exist, and it continues to be funded by the debtor's regular income and post-petition assets as stated in § 1306(a). Second, applying a "plain-meaning" review of § 1329, the court found that a plan can be modified without showing a substantial and unanticipated change in circumstances. Also, the doctrine of res judicata would not bar the trustee from seeking an amendment to the plan. The appeals court noted that given the substantial appreciation of the property's value, allowing the debtors to keep the proceeds and obtain a discharge would defeat Congress's intent to extend the application of the "ability-to-pay" standard forward throughout the duration of the plan.

A similar result was reached in two cases decided by a sister district within this circuit. In the first, *In re Stinson*, 302 B.R. 828 (Bankr.D.Md.2003), the debtors had scheduled their home at $87,000 but post-confirmation attempted to sell it for $133,900. The court granted the trustee's motion to modify the plan. First, the court looked to the language of the confirmation order, noting that the property was an asset of the estate and would not revest in the debtors until after discharge or dismissal of the case. Second, the court applied the "substantial and unanticipated change in circumstances" test and found that the increase in market value was substantial, and the sale of the property was

unanticipated because the plan expressly contemplated that the debtors would retain the property. The court then applied the "best interest of the creditors" test as of the time of the requested modification and not the date of the original plan's confirmation, determining that the plan's current funding failed this test.

In the second case, *In re Morgan*, 299 B.R. 118 (Bankr.D.Md.2003), the debtor had scheduled real property at $135,990 and wanted to sell it post-confirmation for $193,000. Although the bankruptcy court had originally granted the debtor's request, it found in favor of the trustee upon his motion for reconsideration. The court held that the liquidation test under § 1325(a)(4) should be applied at the date of plan modification, citing legislative history from Congress in 1977 ("[T]he application of the liquidation value test must be redetermined at the time of the confirmation of the modified plan."). Applying the liquidation test, the current plan was insufficient. It should be noted that the court considered the property to still be part of the estate, having not re-vested under the terms of the confirmation order.

Trustees have not fared as well in other jurisdictions. In *In re Fitak*, 121 B.R. 224 (D.Ohio 1990), for example, the debtors sold their interest in real estate originally valued at between $130,000 to $132,000 for $152,346.50 post-confirmation. The confirmed plan provided for a 20% payout to unsecured creditors. The trustee then filed a motion to modify the plan. The district court, affirming the bankruptcy court, found that a 20% appreciation in the real property value over a 57–month period was not an unanticipated change in circumstances that would warrant a § 1329 plan modification. Therefore, the trustee's motion was denied.

In *In re Golek*, 308 B.R. 332 (Bankr. N.D.Ill.2004), a debtor with a 10% "pot"

plan sold his residence post-confirmation and sought to pay off his plan with the sales proceeds. The trustee objected, arguing that the proceeds were disposable income, so the debtor must either pay off all unsecured creditors in full or the debtor must devote all of his disposable income into the plan for a minimum of 36 months. The court found in favor of the debtor. First, the court determined that the disposable income test does not apply to a § 1329 motion to modify the plan. Section 1329(b)(1) lists several restrictions on post-confirmation modifications, but the § 1325(b) disposable income test is not among those restrictions. Although § 1325(a) was expressly listed, § 1325(b) was not. Therefore, applying the "plain meaning" approach, the court determined that Congress had not intended to include the disposable income test within the framework of post-confirmation plan modifications. Second, the court stated that proceeds from the sale of real estate are not disposable income. Pre-petition property includes the proceeds from it, so proceeds from a post-petition sale are not post-petition income. In addition, the proceeds from the sale of real estate are not "regular" or recurring in nature that justifies disposable income categorization. These proceeds are a "one-time transformation in form of a pre-petition asset."

Finally, in *In re Euler*, 251 B.R. 740 (Bankr.M.D.Fla.2000), the debtors sought authority to sell real property scheduled at $142,000 post-confirmation for $207,000. The debtors anticipated using the net proceeds to pay off the plan, which had a payout rate of 42%. The trustee objected, arguing that under § 1329 the plan should be modified to increase the distribution to unsecured creditors due to the property's appreciation. Applying the "substantial and unanticipated change in circumstances" test, the court determined that

the trustee could have anticipated that the real estate would appreciate. The trustee could have then objected to confirmation on the basis that the plan lacked a provision allowing the appreciated value of the real estate to be liquidated and applied toward the amount owed to unsecured creditors. The court then stated that prepetition property or its proceeds are not post-petition disposable income. Such real property is a capital asset that does not generate disposable income for purposes of the § 1325(b)(4) liquidation test. Therefore, the court found in favor of the debtors.

### B. *Post–Confirmation Refinance of Real Estate*

A recent decision supporting the trustee's position with respect to post-confirmation refinance is *In re Kieta*, 315 B.R. 192 (Bankr.D.Mass.2004). In that case, a debtor with a confirmed 10% plan sought to refinance her home, which would allow her to make an early, lump-sum payoff of her plan. The court first looked to the language of the confirmation order, which stated that "[u]nless otherwise ordered by the court, all property of the estate as defined in 11 U.S.C. §§ 541 and 1306, including, but not limited to, any appreciation in the value of real property owned by the debtor, as of the commencement of the case, shall remain property of the estate during the term of the plan and shall vest in the debtor(s) only upon discharge." The court found that based on this language in the confirmation order, appreciation in value of the debtor's property is property of the estate. The court then concluded that the debtor's actions constituted a modification of the plan that requires compliance with § 1329(b). Echoing the concerns of *Barbosa*, the *Kieta* court did not approve of the debtor's request to realize proceeds from the appreciation of her property and keep those proceeds above and beyond the amount required to pay off a 10% plan.

Much the same result was reached in *In re Martin*, 232 B.R. 29 (Bankr.D.Mass. 1999). In that case, debtors with a 10% confirmed "pot" plan moved to modify their plan after a mortgage refinancing. The original confirmation order stated that upon confirmation, all property of the estate would vest in the debtors. The debtors proposed to use the proceeds from the refinancing to satisfy their remaining balance of the plan. The debtors also proposed to modify the plan so that their monthly payment would be reduced from 10% of claims as scheduled to 10% of claims as timely filed. The trustee objected to confirmation of the amended plan, arguing that unless the debtors paid 100% of their unsecured claims, they would have to continue making payments for 36 months under the disposable income test of § 1325(b)(1). The court sustained the trustee's objection. First, the court found that the debtors could not modify their confirmed plan in order to reduce their monthly payment just because filed claims were less than scheduled claims. To hold otherwise would conflict with the disposable income requirement under the Code, and it would also raise questions of good faith. Second, the court found that the "disposable income" or "best efforts" test of § 1325(b) applied to the debtors' proposed plan modification. Although the court recognized that the modification requirements of § 1329(b)(1) omit § 1325(b), the court was concerned that not applying the disposable income test to confirmation of a modified plan would motivate chapter 13 debtors with improved financial conditions to not share that good fortune with their creditors. Third, the court determined that the disposable income requirement did not prevent debtors from modifying their plan through a lump-sum payment,

as long as there was no prepayment discount and the disposable income test was met. The court did not have sufficient information to perform a liquidation test under § 1325(a)(4), but it did note that the "effective date of the plan" for purposes of this test is the effective date of the plan as modified.

The trustee's argument has been rejected by other courts. In *Massachusetts Housing Finance Agency v. Evora*, 255 B.R. 336 (D.Mass.2000), for example, the debtors executed a "chapter 20" strategy in which their initial chapter 7 filing was immediately followed by a chapter 13 filing in which the only claim treated was the mortgage against their residence. The residence was valued at confirmation at $80,000.[7] Two years later, the debtors sought to refinance, and at that point the property was worth $156,000. The debtors wanted to pay off their plan through the refinance by making a one-time, lump sum payment in full satisfaction of its plan obligation to the mortgage holder. The creditor objected and argued that the early payoff was a plan modification which required the bankruptcy court to redetermine the value of the collateral, and thus, the amount of the secured claim. The bankruptcy court rejected the argument, and the creditor appealed. The district court affirmed, holding that the refinance and lump-sum early payoff of the plan was not a plan "modification." The court also held that even if early payoff did constitute a modification, no provision of the Bankruptcy Code allowed the amount of a credi-

tor's secured claim to be redetermined in connection with the modification. The court further noted that, because the early payoff included the full amount of the interest that would otherwise have been paid over 60 months, early payment actually benefitted the creditor.

Similar to the present case is *In re Sounakhene*, 249 B.R. 801 (Bankr.S.D.Cal. 2000). In that case, debtors with a 12% confirmed plan refinanced their home and paid the trustee a lump sum of $17,192.92 to prepay their plan. The trustee filed a motion to modify the plan so that the payout percentage would increase to 45%, arguing that the debtors had failed the disposable income test of § 1325(b)(1) by not contributing all of their disposable income for a period of at least 36 months. The court found in favor of the debtors, noting first that under the "plain-meaning" approach to statutory interpretation, the disposable income test should not be read into § 1329. In addition, even if the disposable income test did apply, the debtors would meet this test because the lump-sum amount equaled the aggregate amount of their projected disposable income over the life of the plan.

### III.

The initial question to be resolved is whether a debtor's early payoff of a plan from the proceeds of a sale or a refinance constitutes a plan "modification" by the debtors under § 1329. The trustee here invokes the literal language of § 1329,

---

7. The opinion does not state how the debtors were able to bifurcate the creditor's claim—which at that point stood at $99,640—into secured and unsecured components, given that a chapter 13 plan may not modify the rights of a creditor secured only by a security interest in the debtor's principal residence. *See* § 1322(b)(2), Bankruptcy Code; *Nobelman v. Am. Sav. Bank*, 508 U.S. 324, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993) (chapter 13 plan cannot bifurcate mortgage debt on debtor's principal residence). The court can only assume that the property, although described in the opinion as the debtor's residence, either was not their principal residence or was not the only collateral for the debt.

which allows a plan to be modified after confirmation to

> (1) increase or reduce the amount of payments on claims of a particular class provided for by the plan;
>
> (2) extend or *reduce* the time for such payments; or
>
> (3) alter the amount of the distribution to a creditor whose claim is provided for by the plan to the extent necessary to take account of any payment of such claim other than under the plan.

§ 1329(a)(1)-(3), Bankruptcy Code (emphasis added). Clearly, early payoff of a plan will have the literal effect of reducing the period over which payments are made on "claims of a particular class" (which is what "such payments" grammatically refers to), such as unsecured claims.[8] Additionally, the sale or refinance will itself result in a lump-sum payoff (usually at settlement) of any mortgage arrearage claim being paid through the plan. Yet, the fact remains that such early payoff of the plan has absolutely no prejudicial effect on any party, a point that the district court found persuasive in *Evora*. Although the court acknowledged that there appeared to be decisions on both sides of the question of whether an early payoff constituted a plan modification, it found that the conflict was more apparent than real, and it synthesized what it determined to be the correct rule:

> When determining whether a motion is in fact a modification, courts examine the substance of the plan and the nature of the debtor's obligation to the debtor's creditors, not to the number of payments proposed. If a motion, whether or not styled as a motion to amend the plan, seeks to alter the substance of the plan, it is treated as a modification.

*Evora*, 255 B.R. at 342. The crucial inquiry, according to the court, was not whether the motion affects the "number of payments," but whether it affects "the *amount* to be paid to the *unsecured* creditors." *Id.*

In the present case, neither the motion to sell nor the motion to refinance seeks to reduce the *amount* to be paid the unsecured creditors. Indeed, because there is a time value to money, an early payoff actually *increases* the economic worth, or present value,[9] of the distribution to the unsecured creditors. Even creditors being paid at a nominal 100 cents on the dollar do not in economic terms actually receive that amount when the claim is paid by deferred payments over an extended period of time. For example, using a discount rate of 6% per annum, the present value received by creditor whose $100 claim is paid in equal monthly installments over 36 months is $91.38. If the plan is paid off early at the 12th month, however, the present value increases to $95.14, which is obviously a benefit to the creditor. In such circumstances, to treat the debtor's voluntary early payoff of the plan as a "modification" would represent a triumph of formalism over substance and common sense. Accordingly, the court declines to treat a voluntary early pay-off by the debtors of the confirmed plans in the present cases as a post-confirmation "modification" that triggers *de novo* review of previously resolved confirmation issues, such as the liquidation test.

---

8. Of course, as the court noted at oral argument, debtors might easily moot such an argument by simply including language in the plan reserving the right to pre-pay the plan at any time.

9. *See In re Birdneck Apartment Assocs., II, L.P.*, 156 B.R. 499, 507 (Bankr.E.D.Va.1993) ("Simply stated, 'present value' is a term of art for an almost self evident proposition: a dollar in hand today is worth more than a dollar to be received a day, a month or a year hence.").

## IV.

■ Even though a voluntary early payoff is not a plan "modification," however, that does not mean that the circumstances that enable the debtor to make the payment are irrelevant, since § 1329(a) permits the trustee or an unsecured creditor to seek modification of a plan to increase payments on claims of a particular class when the debtor's financial position, and thus his or her ability to pay, has improved dramatically since confirmation. *Arnold v. Weast (In re Arnold)*, 869 F.2d 240 (4th Cir.1989).

In *Arnold*, the debtor's stated income at the time his 36–month, 20% compromise plan was confirmed was $80,000. *Id.* at 241. As it turned out, he actually earned $102,000 that year, $146,500 the next year, and $200,000 the following year. *Id.* On motion of an unsecured creditor, the bankruptcy court increased the monthly plan payment from $800 per month to $1,500 per month and extended the plan term to 60 months. The debtor took an appeal, and both the district court and the Fourth Circuit affirmed. The Court first rejected the debtor's argument that increasing the plan payments contravened Congress's intent to give debtors a "fresh start" through bankruptcy, noting, "Congress . . . intended that the debtor repay his creditors to the extent of his capability during the Chapter 13 period. Certainly, Congress did not intend for debtors who experience substantially improved financial conditions after confirmation to avoid paying more to their creditors." *Id.* at 242 (internal citation omitted). The Court also rejected the debtor's argument that the confirmation order was res judicata on the issue of his ability to pay. The Court held that this was true "only where there have been no unanticipated, substantial changes in the debtor's financial situation." *Id.* at 243. The Court then adopted what it described as an "objective test . . . to determine whether a change was unanticipated: 'whether a debtor's altered financial circumstances could have been *reasonably anticipated* at the time of confirmation by the parties seeking modification.'" *Id.* Because, in the Court's view, the creditor "should not be expected to have anticipated a $120,000 jump in [the debtor's] income in only two years," res judicata presented no bar to an upward adjustment in the debtor's monthly payment "to take into account the unanticipated and substantial improvement in his financial condition." *Id.; see also In re Euerle*, 70 B.R. 72 (Bankr.D.N.H.1987) (receipt of inheritance having net value of $300,000 warranted modification of confirmed 5–year plan to provide for 100% rather than 73% payment to unsecured creditors); *In re Koonce*, 54 B.R. 643 (Bankr.D.S.C.1985) (lottery winnings of $1.3 million payable over 20 years was dramatic change in debtors' income warranting 100% payment to unsecured creditors).

■ In each of the two cases currently before the court, the trustee has filed a motion to modify the confirmed plan to provide for full payment of unsecured claims. Under *Arnold*, the test is whether the increased value of the real estate represents a "substantial" change in the debtor's financial situation and whether the party seeking modification—here, the trustee—could have "reasonably anticipated" the magnitude of the change at the time of confirmation.

### A.

■ Mr. Murphy listed the value of his condominium as of December 2003, when his bankruptcy petition was filed, at $155,000. In November 2004, he sold it for $235,000, a 51.6% percent increase in only 11 months. That this represents a "substantial" improvement in the debtor's

financial condition is hardly open to question. The question is whether, as an objective matter, the trustee could have "reasonably anticipated" such an increase at the time of confirmation. Certainly, the trustee is held to the general knowledge that real estate in the Washington metropolitan area has (with occasional market glitches) enjoyed a consistently healthy appreciation in value. In the two years preceding plan confirmation, for example, the increase in the Housing Price Index for the Washington–Alexandria–Arlington DCVA–MD–WV MSA ranged from 10 to 13% per year. Thus, had Mr. Murphy sold his condominium in the first year for an amount, say, 15% or perhaps even 20% higher than the amount shown on the schedules, the court might be hard-pressed to find that the increase could not have been reasonably anticipated. However, 51.6% is a different matter altogether. By any standard, it is dramatic. Certainly, there was no precedent within the last 10 to 15 years for an increase of such magnitude in so short a period of time. Accordingly, the court concludes that there has been a substantial, unanticipated change in the debtor's financial condition.

■ Moreover, the improvement does not consist of either unrealized or phantom income—a mere improvement in the debtor's balance sheet—but of actual cash in the debtor's pocket that is reasonably available to pay creditors and that the debtor—who has not offered any evidence suggesting otherwise—can apparently afford to pay without financial hardship.[10]

As the Fourth Circuit held in *Arnold*, Congress did not intend for chapter 13 debtors "who experience substantially improved financial conditions after confirmation to avoid paying more to their creditors." Allowing the debtor to compromise his unsecured creditors at 37 cents on the dollar while pocketing more than $80,000 from the sale of the property less than one year after the plan is confirmed simply fails to comport with the fundamental obligation of good faith. Accordingly, the court finds that the trustee has established good cause for modification of the plan to provide for full payment of unsecured claims.

### B.

The debtor argues, however, that because his plan provided for property of the estate to revest in him at confirmation, the condominium was no longer property of the estate at the time it was sold, thereby precluding any claim by creditors or the trustee to share in its appreciation. In this connection, the debtor correctly notes that the confirmation orders in *Stinson* and *Morgan* expressly provided that property of the estate would not revest in the debtors until the debtors were discharged after plan payments were complete.

Although the debtor's argument has a surface appeal, the court concludes that whether the property revested at confirmation is ultimately not dispositive on the issue of whether the trustee can seek modification of the plan to account for the sales proceeds realized by the debtor. As an initial matter, the court notes that

10. The debtor has not filed with the court a report of sale as required by LBR 6004–2(D), and the court therefore has no precise information as to the amount of cash realized by the debtor from the sale. However, working from the sales price of $235,000 and a mortgage balance of $121,000 as shown on the debtor's schedules, and also assuming a 6% broker's commission and other sales costs of 2%, the debtor would have netted approximately $95,200. After paying $12,000 to the trustee to complete the scheduled payments under the plan, the debtor would still have $83,200. As noted, the additional amount needed to pay filed claims at 100% rather than 37% is approximately $20,000. That would still leave the debtor with approximately $63,200.

there is considerable disagreement, even within this district, over exactly what revesting means. *See In re Leavell,* 190 B.R. 536, 539 (Bankr.E.D.Va.1995) (St. John, J.) (discussing conflicting lines of cases and concluding that only property that is necessary to implement the plan remains property of the estate after confirmation); *In re Reynard,* 250 B.R. 241 (Bankr.E.D.Va.2000) (Mayer, J.) (holding that all post-petition earnings, not merely those needed to fund the plan, are property of the estate). But as the court noted in *Barbosa,* regardless of whether property revesting in the debtor is technically property of the estate, "until all payments due under the plan are made, both the trustee and the unsecured creditors have an interest in the preservation of the debtor's financial situation, and in the extension of the ability-to-pay standard to future situations under the plan." *Barbosa,* 235 F.3d at 37. The debtor's revesting argument, taken to its logical conclusion, would effectively read § 1329 out of existence, and is inconsistent with the holding in *Arnold.* Mr. Arnold's post-petition earnings were just as much his property following confirmation as the condominium was Mr. Murphy's. But that did not preclude modification of Mr. Arnold's plan to take account of the unexpected improvement in his financial condition. There is no reason why a different result should follow simply because the improvement consists of cash realized from the sale of the debtor's residence rather than earnings from employment.

■ Nor does the court's holding depend on whether the sales proceeds consti-

tuted "disposable income" as that term is used in the Bankruptcy Code. The disposable income test, which is set forth at § 1325(b), Bankruptcy Code, requires that, upon objection by the trustee or an unsecured creditor, a debtor must either pay claims in full or must pay his or her disposable income into the plan for 36 months. As noted, some courts have held that the omission in § 1329 of any reference to § 1325(b) means that the disposable income test does not apply to postconfirmation plan modifications. Such a reading of the statute, if correct, could certainly lead to anomalous results, but is essentially irrelevant to the present motion. The Fourth Circuit's holding in *Arnold* is not phrased in terms of changes in the debtor's disposable income, but rather in terms of the debtor's "financial condition," which is a broader concept. The requirement in *Arnold* that the debtor share any substantial and unanticipated improvement with his or her creditors is not grounded in the disposable income test, but rather in the fundamental requirement of good faith under § 1325(a)(3). *See also Solomon v. Cosby (In re Solomon),* 67 F.3d 1128 (4th Cir. 1995) (holding that "disposable income" did not include imputed income from exempt IRA's where the debtor, although eligible to withdraw without penalty, was not actually doing so; but remanding for determination of good faith). Thus, whether the proceeds from the sale of the condominium constitute "disposable income" in a technical sense is not controlling on the good faith analysis.[11]

---

**11.** That said, it is difficult to see why the proceeds would *not* constitute "income," and "disposable" income at that. The sale of an appreciated asset generates income for both accounting and income tax purposes. In some instances (such as where depreciation has been taken or the property has been refi-

nanced), the income may be more phantom than real. But here the sale resulted in actual cash. Why something that is legally income for tax purposes and that represents actual cash that the debtor is free to spend should not be considered income is a mystery. However, the court's ruling is this case is not

### C.

With respect to Mr. and Ms. Goralski's case, the record does not reveal the loan terms and, in particular, the amount of the "cash out" after payment of the existing mortgages.[12] But based on the statements made by the parties at oral argument, it would appear that the debtors received at least $63,365 from the refinance. Their schedules reflected a market value for the property on the petition date of $223,000 and a mortgage balance of $192,400, leaving an equity of $30,600 (for a loan to value ratio of approximately 86%). Assuming that the loan to value ratio for the refinance was no higher than the existing 86%, the property must have appraised for at least $297,400. This would have represented an increase of $74,400, or 33%, over an 18–month period. While clearly "substantial," it may not qualify as "dramatic" in the quite the same way as, say, the increase of Mr. Arnold's salary from $80,000 to $200,000 over a two-and-a-half-year period. For that reason, the court might have some difficulty in finding that appreciation of this magnitude was something the trustee could not reasonably have anticipated at the time the plan was confirmed.

But even if the appreciation could be fairly characterized as both substantial and unanticipated, the court cannot find that the refinance effected an improvement in the debtors' *financial condition* sufficient to support involuntary modification of their plan. The refinance simply exchanged the increase in the value of the house for a corresponding amount of debt. While it is true that the debtors, by refinancing, have in a colloquial sense "tapped" the equity

that has accrued since confirmation, the cash they have received is by no means found money. What the debtors have received, very simply, is a loan. A loan does not represent income, nor does it improve a debtor's financial condition. Rather, the cash received from a loan is balanced by a corresponding debt, with the result that the debtors' net worth remains unaltered. The trustee does not suggest that the debtors could have been compelled, 18 months into a five-year plan, to incur indebtedness and borrow against the equity in their residence so as to increase the dividend on unsecured claims regardless of how much the property might have appreciated during the plan term. The fact that the debtors (whether wisely or otherwise) voluntarily decided to borrow against the equity should not result in a different outcome. Additionally, there is no evidence of any bad-faith motivation for the refinance. The trustee has not disputed the debtors' explanation that they refinanced in order to take advantage of the current low interest rates and reduce their monthly financial burden after Mr. Goralski's income was reduced. The trustee's motion to modify the plan and to require the debtors to pay borrowed funds in order to increase the dividend on unsecured claims will therefore be denied.

### D.

Separate orders will be entered granting the trustee's motion to modify the plan in the Murphy case and denying the motion in the Goralski case.

---

predicated on the status of the proceeds as income.

**12.** Since it is the trustee's motion to modify the plan, the trustee has the burden of proof.

Thus, any gaps in the evidence must be construed against the trustee.

EXHIBIT

Housing Price Changes Over Same Quarter (3Q) of Prior Year

- - - National  — ✳ — Virginia  — ◆ — Wash DC MSA